358 F.2d 21
 BEDFORD-NUGENT CORPORATION, an Indiana corporation,
Plaintiff-Appellant,
v.
CHAUFFEURS, TEAMSTERS AND HELPERS, LOCAL UNION NO. 215,
INTERNATIONALBROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF
AMERICA,Defendant-Appellee.
 No. 15352.
 United States Court of Appeals Seventh Circuit.
 March 3, 1966.
 
 Wells T. Lovett, Owensboro, Ky., Jack A. Stone, Stone & Stone, Evansville, Ind., for appellant.
 Edward J. Fillenwarth, Edward J. Fillenwarth, Jr., Indianapolis, Ind., Wilbur F. Dassel, Evansville, Ind., for appellee.
 Before SCHNACKENBERG, CASTLE and SWYGERT, Circuit Judges.
 CASTLE, Circuit Judge.
 
 
 1
 Bedford-Nugent Corporation, plaintiff-appellant, brought this action in the District Court under the provisions of Section 303 of the National Labor Relations Act, as amended, (29 U.S.C.A. 187) to recover compensatory damages from the defendant-appellee Union.[1] The damages are alleged to have been occasioned by activity of the Union charged to be an unfair labor practice under the provisions of Section 8(b)(4) of the Act (29 U.S.C.A. 158(b)(4)).[2] The cause was tried to the court without a jury. The court made and entered findings of fact and conclusions of law. On the basis of the facts found the court concluded that although the activity of the Union clearly fell within clauses (i) and (ii) of Section 8(b)(4) it was excluded from the unfair labor practices defined by that section because it was within the protected area of primary picketing carved out in the proviso to subsection (B) of Section 8(b)(4). The court regarded United Steelworkers of America, etc. v. National Labor Relations Board, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863, as dictating such conclusion. A judgment order dismissing the action was entered and the plaintiff appealed.
 
 
 2
 The factual findings of the District Court are not challenged. Insofar as they are pertinent to the issue presented on appeal they may be summarized as follows. Plaintiff is engaged in the business of extraction and preparation of river sand and gravel for sale locally and in interstate commerce. Its operations are conducted at premises in Evansville, Indiana, in Rockport, Indiana, and in Henderson, Kentucky. The Union, which was not the certified bargaining representative of plaintiff's employees, picketed the plaintiff's premises at each of the three locations during the period of September 26, 1961, through November 7, 1961, and some of plaintiff's employees who were members of the Union joined in the picketing. In addition to the picketing the Union engaged in other activities at the primary sites. Said activities included the placing of nails and tacks at the entranceways to plaintiff's premises, the shooting of an air pistol at the radiators and windshields of vehicles of approaching customers, the blocking of entranceways by pickets who refused to stand aside, and the threatening of physical injury and property demage to customers who attempted to enter or did enter plaintiff's premises. Although the Union's activities did not stop all customers from entering plaintiff's premises, it did have the effect of deterring a substantial number. The picketing and the above detailed activities of the Union were engaged in in part for the purpose of inducing customers to refuse to transport or otherwise handle plaintiff's goods and materials, or to perform any services, or in order to threaten, coerce or restrain plaintiff's customers. The object of the activities was to force such customers to cease doing business with plaintiff and to force plaintiff to recognize the Union as the representative of plaintiff's employees.
 
 
 3
 It is apparent from the court's factual findings that this case involves only picketing and activities at the premises of the employer. It does not involve common situs or separate gate picketing or activities, or the contacting of customers, employees of customers, or others, away from the primary picket lines at the employer's premises.
 
 
 4
 Section 303 makes activity or conduct of a labor organization which is 'defined as an unfair labor practice' by Section 8(b)(4) unlawful for the purpose of authorizing suit for damages in a United States district court against the labor organization by a person injured in his business or property by reason of such unfair labor practice.
 
 
 5
 The contested issue presented for our determination is whether the District Court erred in concluding that the activity and conduct of the Union did not constitute an unfair labor practice as defined in Section 8(b)(4).
 
 
 6
 Plaintiff contends in substance that because the picketing and accompanying activities here involved were directed in part at customers and employees of customers seeking entrance to the plaintiff's premises the Union's conduct is a secondary activity proscribed as an unfair labor practice and therefore unaffected by the proviso to subsection (B) of Section 8(b)(4). In this connection it is urged that Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, d/b/a Lester Morton Trucking Co., 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 is apposite and that United Steelworkers of America, etc. v. National Labor Relations Board, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863, is distinguishable on the ground that the picketing held to be within the protected area of primary activity in Steelworkers was aimed at secondary employees who furnished day-to-day services essential to the primary employer's regular operations, rather than at employees of customers as in the instant case.
 
 
 7
 But an analysis of those two decisions in the light of the background and rationale furnished by Local 761, International Union of Electrical, Radio & Machine Workers, AFL-CIO v. National Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (the General Electric case), in which the Court took occasion to survey the cases dealing with picketing at both primary and secondary sites, convinces us that it is Steelworkers which is controlling here and that Morton is distinguishable.
 
 
 8
 In Steelworkers it is stated (376 U.S. 492, 498-499, 84 S.Ct. 899, 903):
 
 
 9
 'We think General Electric's construction of the proviso to 8(b)(4)(B) is sound and we will not disturb it. The primary strike, which is protected by the proviso, is aimed at applying economic pressure by halting the day-to-day operations of the struck employer. But Congress not only preserved the right to strike; it also saved 'primary picketing' from the secondary ban. Picketing has traditionally been a major weapon to implement the goals of a strike and has characteristically been aimed at all those approaching the situs whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt. In light of this traditional goal of primary pressures we think Congress intended to preserve the right to picket during a strike a gate reserved for employees of neutral delivery men furnishing day-to-day service essential to the plant's regular operations.'
 
 
 10
 We think it obvious that customers and employees of customers who seek entrance to the primary employer's premises are likewise neutrals who approach the situs with a mission 'contributing to the operations' of the primary employer. Customers are essential to the continued operation of the plaintiff's business. To deter them from entering the plaintiff's premises is certainly an application of economic pressure at the primary situs. We agree with the District Court that Steelworkers is dispositive of the issue here presented. Both the situs and the object of the picketing were primary and therefore the Union's conduct, although reprehensible, did not constitute an unfair labor practice as defined in Section 8(b)(4).
 
 
 11
 Plaintiff's reliance on Morton is misplaced. The facts there involved, as disclosed in the District Court's opinion (200 F.Supp. 653, 659 and 660), reveal that contacts were made by the union representatives with the employees of O'Connel Coal Company, a customer of the primary employer, not at the latter's premises but at sites away from the primary picket line. Such activity was secondary and not affected by the proviso to subsection (B). And it was the away from the primary situs feature of the activities which was controlling as to the O'Connel phase of the Morton case.
 
 
 12
 In concluding we note that in Steelworkers it was recognized (376 U.S. 492, 501-502, 84 S.Ct. 899) that primary picketing, excluded by the proviso to subsection (B) of Section 8(b)(4) from activity defined as an unfair labor practice, does not become illegal secondary activity because it is accompanied by threats and violence. The Court pointed out that the legality of violent picketing, if 'primary', must be determined under other sections of the statute or under state law. And, the Court construed the proviso to 8(b)(4) as saving from the proscription of that section primary picketing which, as is in the case of the use of violence or other unlawful conduct, is forbidden by some other law. In this connection the Court reasoned (376 U.S. 492, 501-502, 84 S.Ct. 899, 905):
 
 
 13
 'Such picketing does not become illegal secondary activity when violence is involved but only when it interferes with business intercourse not connected with the ordinary operations of the employer. This is not to say, of course, that violent primary picketing is in all respects legal but only that it is not forbidden by 8(b)(4); it would escape neither the provisions of the federal law nor the local law if violative thereof.
 
 
 14
 This is all, we think, that was intended by the proviso to 8(b)(4) which provides that nothing in subsection (B) 'shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.' It is possible to read this language to mean that the proviso does not save from proscription under 8(b)(4) union activity violative of other laws, but this interpretation would condemn as secondary conduct any and all picketing directed toward neutral employers so long as the conduct, as in the case of violence, was forbidden by some other law. In our view, the words 'where not otherwise unlawful' were inserted only to make clear that the proviso, while excluding the conduct from the 8(b)(4) sanctions did not also legalize it under other laws, state or federal. The legality of violent picketing, if 'primary,' must be determined under other sections of the statute or under state law.'
 
 
 15
 Accordingly, redress for the unlawful aspect of such primary picketing must be found under the provisions of some law other than 303 which is designed to vest the federal district courts with jurisdiction of suits for damages against unions in but a limited class of unfair labor practices.
 
 
 16
 The judgment order of the District Court is affirmed.
 
 
 17
 Affirmed.
 
 
 18
 SCHNACKENBERG, Circuit Judge (dissenting).
 
 
 19
 There is no dispute that the union placed nails and tacks at the entranceways to plaintiff's premises, shot an air pistol at the radiators and windshields of vehicles of approaching customers, blocked entranceways and refused to stand aside, and threatened physical injury and property damage to customers who attempted to enter or did enter plaintiff's premises. But the union seeks to avoid responsibility for its acts by asserting that it falls within the proviso in 8(b)(4)(B).
 
 
 20
 * * * Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
 
 
 21
 It should be emphasized, however, that the act states that primary picketing is not to be made unlawful 'where not otherwise unlawful.' Here, the union's acts involved interference with customers and their property and constituted, according to the laws of the states, trespass, assault and malicious mischief. Thus, the union's acts were unlawful but they were not made unlawful by clause (B). Neither can they be made lawful by said clause. Steelworkers, cited by Judge CASTLE, recognized this in effect when, 376 U.S. at pages 501-502, 84 S.Ct. at page 905 the court said:
 
 
 22
 '* * * This is not to say, of course, that violent primary picketing is in all respects legal but only that it is not forbidden by 8(b)(4); it would escape neither the provisions of the federal law nor the local law if violative thereof.'
 
 
 23
 Where the record indicates that the acts were unlawful, the union had the burden of proving their lawfulness. This it did not do; it made no attempt to do so.
 
 
 24
 It is clear that the proviso in clause (B) did not exculpate the union from the effect of its unlawful primary picketing in this case.
 
 
 25
 I would reverse the order of the district court.
 
 
 
 [1]
 Chauffeurs, Teamsters and Helpers, Local Union No. 215, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America
 
 
 [2]
 Insofar as here pertinent Section 8(b)(4) provides as follows:
 '(b) It shall be an unfair labor practice for a labor organization or its agents-- '(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-- '(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.'